IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| OZARK PURCHASING LLC., d/b/a )<br>O'REILLY AUTO PARTS, et al., )<br>)<br>Plaintiffs, )<br>)<br>vs. )<br>)<br>FALCON STEEERING SYSTEMS, INC.,)<br>)<br>Defendant. ) | Case No. 12-3415-CV-S-ODS |

## ORDER AND OPINION (1) GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION TO DISMISS AND (2) DISMISSING COUNT I OF DEFENDANT'S COUNTERCLAIM

Pending is Plaintiff's Motion to Dismiss, which targets Count I and Count VII. The motion (Doc. # 19) is granted in part and denied in part. More specifically, the motion is granted with respect to Count I and it is denied with respect to Count VII.

## I. BACKGROUND

Collectively, Plaintiffs operate retail automobile parts stores and operate under the name "O'Reilly Auto Parts." Plaintiffs and Defendant entered an agreement whereby Defendant supplied certain auto parts to be sold in Plaintiffs' stores. Plaintiffs allege the agreement authorized them to assess certain charges if Defendant failed to meet Plaintiffs' requirements, and this forms the basis for Plaintiffs' claims against Defendant. Plaintiffs' claims need not be discussed further because, while the counterclaims at issue involve the parties' agreement, they do not relate to Plaintiffs' claims.

Count I of Defendant's counterclaims asserts a claim for securities fraud and Count VII asserts a claim for unjust enrichment. The factual underpinnings for each claim are different.

## A. Count I –Securities Fraud

The securities fraud claim arises from what Defendant identifies as the "O'Reilly-CSK Acquisition Market Development Plan" (hereinafter "the Plan"). Under the Plan, two different funds were created: the Business Development Fund ("BDF") and the Market Development Fund ("MDF"). As described by Defendant (because Defendant has not attached a copy of any written agreements to its Answer and Counter claim), BDF and the MDF were used by Plaintiffs to convert stores, fund marketing efforts, and engage in other activities to increase Plaintiff's sales – which, in turn, would inure to the benefit of Plaintiff's suppliers, including Defendant. The BDF was "funded" by a 3% reduction in the prices Defendant charged Plaintiffs, and the MDF was "funded" with set monthly payments. Plaintiffs justified the Plan by pointing to sales projections for five years. Answer and Counterclaim ("AC") ¶¶ 24-28; Defendant's Suggestions in Opposition at 2.

Defendant contends its participation in the Plan – which was really a part of the larger agreement between the parties whereby Defendant sold parts for resale by Plaintiffs – was induced by false statements. It describes those false statements as appearing in paragraphs 27 and 28 of the Answer and Counterclaim. Defendant's Suggestions at 12-13. However, neither the Answer and Counterclaim generally nor paragraphs 27 and 28 specifically explain how any of Plaintiffs' statements were false. Those paragraphs contain statements, but that is all.

Defendant's Suggestions in Opposition attempts to breathe additional life into Defendant's assertion that false statements were made by alleging the following statements were made:

1. Plaintiffs wanted to grow their business.
2. Sales estimates for the five years from 2009 through 2013 were presented.
3. Plaintiff "represented that it was utilizing a five year sales projection because at a minimum, Falcon would be given five years in which to recoup its investment in the" BDF and MDF.
4. "O'Reilly represented to Falcon that it was awarded the entire Master Pro chassis business in both existing O'Reilly stores and CSK stores."

5. Additional five-year projections were provided.
6. Plaintiff represented that it anticipated spending $180 million to enter new markets in Salt Lake City, Seattle, Denver and Southern California.

Defendant alleges these statements were false because instead of using the BDF and MDF for their intended purpose, the money was used to reduce Plaintiffs' costs and expenses. AC, ¶ 37. Defendant also alleges Plaintiffs' statement that there would be a five-year relationship was false when made, as evidenced by the fact that Plaintiff severed the relationship before five years passed. AC, ¶¶ 40-41. The sales projections are also false, but the Answer and Counterclaim's only explanation for this is that the projections did not come to fruition: there is no allegation that they were known or suspected to be false when made. AC, ¶¶ 42-44.

## B. Count VII – Unjust Enrichment

Count VII is rather straightforward. Defendant alleges it supplied Plaintiffs with auto parts for which Plaintiffs have not paid. It alleges the reasonable value of those parts exceeds $880,000. AC, ¶¶ 117-19.

## II. DISCUSSION

The liberal pleading standard created by the Federal Rules of Civil Procedure requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Erickson v. Pardus, 551 U.S. 89, 93 (2007) (per curiam) (quoting Fed. R. Civ. P. 8(a)(2)). "Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Id. (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)). In ruling on a motion to dismiss, the Court "must accept as true all of the complaint's factual allegations and view them in the light most favorable to the Plaintiff[ ]." Stodghill v. Wellston School Dist., 512 F.3d 472, 476 (8th Cir. 2008).

3

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009).

With respect to the securities fraud claim, the Private Securities Litigation Reform Act of 1995 ("PSLRA") "dictates a modified analysis due to its special heightened pleading rules." Kushner v. Beverly Enter., Inc., 317 F.3d 820, 824 (8th Cir. 2003). The purpose of the heightened pleading standard was to eliminate abusive securities litigation and put an end to the practice of pleading "fraud by hindsight." In re Vantive Corp. Secs. Litig., 283 F.3d 1079, 1084-85 (9th Cir. 2002). The PSLRA requires plaintiffs "to specify each misleading statement or omission and specify why the statement or omission was misleading." Id. at 326 (citing 15 U.S.C. § 78u-4(b)(1)). The complaint must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2); see also Kushner, 317 F.3d at 826 (citation omitted). Finally, the Court must "disregard 'catch-all' or 'blanket' assertions that do not live up to the particularity requirements." Id. at 824 (quoting Florida State Bd. of Admin. v. Green Tree Fin. Corp., 270 F.3d 645, 660 (8th Cir. 2001)).

### A. Count I –Securities Fraud

Plaintiffs present several arguments to justify dismissal of the first counterclaim. The Court will not address them all, but the failure to address a particular argument should not be construed as either rejection or agreement.

## 1. Existence of a Security

It requires no authority to establish that a securities fraud claim cannot lie where no security is involved. The term is statutorily defined to include an "investment contract," 15 U.S.C. § 77b(1), and this is the theory Defendant advances. The statute does not define the phrase "investment contract," but the Supreme Court has held it "means a contract, transaction, or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party . . . ." SEC v. W.J. Howey Co., 328 U.S. 293, 298-99 (1946). The Eighth Circuit has relied on Howey to hold that an investment contract is a security within the meaning of the federal securities laws "if (1) there is an investment of money, (2) in a common enterprise, (3) with the reasonable expectation of profits, (4) to be derived from the entrepreneurial or managerial efforts of others." Great Rivers Co-op of SE Iowa v. Farmland Indus., Inc., 198 F.3d 685, 700 (8th Cir. 1999). Defendant argues the BDF and MDF qualify because they represent an investment of Defendant's money in a common enterprise – namely, Plaintiffs' expansion and marketing efforts – that were to be performed by Plaintiffs, and the enterprise was supposed to result in increased sales and, thus, increased profits for Defendant. The problem with Defendant's reasoning is that it would transform virtually any business relationship in which one party's profits depends on another party's efforts into an investment contract. This concern has motivated courts to not only analyze whether a particular transaction or relationship meets the black-letter definition of an investment contract, but also examine the nature of the relationship and consider whether there is a prospect for appreciation of capital or a return of the initial investment. E.g., . Here, those features are lacking.

Howey itself involved a company that owned large citrus groves. The defendant sold small tracts of land to individual investors and offered investors a "service contract" that allowed the defendant to cultivate, harvest and market the crops on each parcel on behalf of the investors. As described by the Eighth Circuit,

5

> The Court recognized that "something more than fee simple interests in land, something different from a farm or orchard coupled with management services" was needed to convert these sales of land into investment contracts. That "something more" was the company's plan to gather the individual plots and manage them as one. The investors realized that they were part of a larger scheme, the success of which depended on the company's ability to manage a large grove. The plan ran through the whole transaction as the thread on which everybody's beads were strung. The only way the investors could hope for a return on their investment was by absolute reliance on the effort and abilities of the company.

Schultz v. Dain Corp., 568 F.2d 612, 614-15 (8th Cir. 1978) (internal quotations and citations omitted). Here, the "something more" is missing. Construed in the light most favorable to Defendant, Defendant was a vendor, and it sold goods to Plaintiffs for resale in retail locations. As part of the negotiation of the price, Plaintiffs represented that in exchange for price concessions and a pooling of money, Plaintiffs would undertake efforts to increase sales of those goods. The "absolute reliance" that was critical in Howey (and the Eighth Circuti's interpretation of Howey) is absent.here. Defendant's ability to receive increased profits did not depend entirely on Plaintiffs. Defendant controlled the timeliness of delivery, had the ability to market its own products, and was capable of engaging in a myriad of actions that would improve the venture's profitability. This stands in stark contrast to the citrus grove investors, who "had no right of entry" onto the land and "lacked the necessary knowledge, skill and equipment to care for the trees." Id. at 614.

In addition, Defendant's expectation of increased profits through increased sales is not the sort of profit the Supreme Court meant in Howey. For this, one only need examine subsequent Supreme Court discussions on the point. For instance, in SEC v. Edwards, the Court noted "when we held that 'profits' must 'come solely from the efforts of others,' we were speaking of the profits that investors seek on their investment, not the profits of the scheme in which they invest. We used 'profits' in the sense of income or return, to include, for example, dividends, other periodic payments, or the increased value of the investment." 540 U.S. 389, 394 (2004). Later, the Edwards Court referred to one of its prior decisions that identified "two examples of investor interests that we had

6

previously found to be 'profits.' Those were 'capital appreciation resulting from the development of the initial investment' and 'participation in earnings resulting from the use of investor funds.'" Id. at 395 (quoting United Housing Foundation, Inc. v. Forman, 421 U.S. 837, 852-53 (1975)). While this language from Forman is not an "exclusive list," it "supports the commonsense understanding of 'profits'" in this context. Id. at 396. And in this context, the benefits from increased business that Defendant expected cannot be considered "profit" of the sort that will support a securities fraud claim – if it could, every cooperative venture could be characterized as an investment contract.

Construing the facts in Defendant's favor persuades the Court that the parties had a cooperative business venture and there was no investment contract within the meaning of the federal securities laws. For this reason, the first counterclaim fails as a matter of law.

### 2. Scienter

As noted earlier, the PSLRA requires that scienter be pleaded with particularity. Scienter means the intent to deceive, manipulate, or defraud, or that the one charged acted with severe recklessness. Horizon Asset Mgt., Inc. v. H&R Block, Inc., 580 F.3d 755, 761 (8th Cir. 2009). "Scienter can be established in three ways: (1) from facts demonstrating a mental state embracing an intent to deceive, manipulate, or defraud; (2) from conduct which rises to the level of severe recklessness; or (3) from allegations of motive and opportunity." Cornelia I. Crowell GST Trust v. Possis Medical, Inc., 519 F.3d 778, 782 (8th Cir. 2008). The allegations must be examined collectively, id. (citing Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007)), and collectively those facts must create a reasonable *and* strong inference that the securities fraud defendant acted with the necessary intent. E.g., Tellabs, Inc., 551 U.S. at 313-14; Kushner, 317 F.3d at 826-27. "Catch-all" or generalized allegations of scienter are to be ignored. E.g., In re Navarre Corp. Sec. Litig., 299 F.3d 735, 741 (8th Cir. 2002).

Defendant contends it has sufficiently pleaded the existence of scienter because Plaintiffs were motivated to obtain financing, the sales projections were wrong, and

7

Plaintiffs stopped buying parts from Defendant before the five years encompassed by the projections had passed. These allegations are insufficient. First, alleging that Plaintiffs had some incentive or motive to commit fraud is not automatically sufficient. Such an allegation can be relevant, but the Counterclaim must allege that the motivation or incentive is of an unusual or overwhelming magnitude. Horizon Asset Mgt., 580 F.3d at 766. Greed is an always-present motive, and alleging that Plaintiffs needed money is, alone, not a strong indicator of scienter. The inaccuracy of the projections is also insufficient, primarily because Defendant has done nothing more than allege, in conclusory fashion, that the projections were false. Even if one accepts the projections were not 100% accurate, the degree of inaccuracy is relevant to determining how strong the inference of scienter really is. Finally, the fact that the parties' business relationship did not last five years is not indicative that any false statements were made – much less that any false statements were made with the requisite scienter. For this to be a factor, Defendant would have to allege that at the time the relationship was formed Plaintiffs intended to terminate the relationship before five years had passed.

Defendant has preemptively sought leave to amend its pleadings if the Court finds they fail to pass muster under the PSLRA. The request is denied for two reasons. First, Defendant offers no basis for believing it *can* adequately allege scienter exists. Second, and perhaps more importantly, amending the allegations regarding scienter will not cure the absence of a security as discussed in Part II.A.1, above.

### B. Count VII – Unjust Enrichment

Plaintiffs allege the Unjust Enrichment counterclaim conflicts with Defendant's breach of contract claim (Count VI). Both counterclaims seek monetary damages for Defendant's delivery of parts, but they differ in that Count VI alleges a contract existed and Count VII seeks recovery for unjust enrichment – which presupposes that a contract did not exist.

Defendant acknowledges – and the Court agrees – that Defendant cannot recover on both theories. However, Defendant argues – and the Court agrees – that Defendant

8

may plead alternative theories of recovery. See Fed. R. Civ. P. 8(d)(2); Owen v. General Motors Corp., 2006 WL 2808632 (W.D. Mo. 2008).

### III.   CONCLUSION

Plaintiffs' motion is granted in part and denied in part.   Defendant's first counterclaim is dismissed, and Defendant's seventh counterclaim is not dismissed.

IT IS SO ORDERED.

                                                          /s/ Ortrie D. Smith
                                                          ORTRIE D. SMITH, SENIOR JUDGE
DATE: February 26, 2013                     UNITED STATES DISTRICT COURT